34   205
s36   197

KENNEDY, ADMINISTRATRIX, APPELLANT, v. DICKIE, RE-
SPONDENT.

(No. 2,261.)

(Submitted April 9, 1906.  Decided May 14, 1906.)

*Ejectment—Public Lands—Proceedings in Land Office—Witnesses—Fraud—Findings.*

Ejectment—Findings—Public Lands—Proceedings in Land Office—Preventing Witnesses from Testifying.
1.   A finding of the district court, in an action in ejectment, that plaintiff had prevented defendant from producing a certain witness in the hearing of a contest, for the land in question, in the United States land office, was not supported by the evidence, which showed that plaintiff had brought the witness some distance to the place of hearing to testify for him, but upon inquiry found that he would not testify as expected, and therefore sent him home, saying that he did not want his opponent to get hold of him, a party not being under any obligation to reveal the existence of evidence to his adversary to his own detriment.

Same—Preventing Witnesses from Testifying—Evidence.
2.   The district court committed error in finding in an action in ejectment, that plaintiff procured another to cause the arrest and imprisonment of two persons so as to prevent their evidence from being secured by defendant in a contest for the land in question, in the land office of the United States, where it appeared from the evidence that while plaintiff and the persons causing the arrest were intimate and were witnesses at the trial of the contest and at the trial of the persons arrested, there was nothing to show that plaintiff had instigated the arrest or that the motive of him who caused it was to aid plaintiff.

Same—Fraud—Conspiracy—Evidence—Findings.
3.   Evidence in a suit to recover possession of certain land, that plaintiff and another were on a friendly footing and that the latter aided the former to establish his claim to the land in question in the United States land office, did not warrant the district court in finding that they had entered into a conspiracy to defraud the defendant of the land.

Same—Powers of Land Department—Review of Decisions.
4.   If the officers of the federal Land Department, to which tribunal is confided the power to determine rights growing out of settlements upon the public lands, err in the interpretation of the law applicable to the facts presented, or a fraud is practiced by one claimant upon another, or fraudulent practices are resorted to by the officers themselves, by reason of which title is granted to a party not entitled thereto, their action may be reviewed and annulled by a court of equity; but for mere errors of judgment upon the weight of the evidence produced before them in a given case, the only remedy is by appeal to the proper officer of the department, and the rulings then made are final and conclusive upon all courts.

Same—Witnesses—False Testimony at Contest—Fraud—Courts—Immaterial Findings.
5.   A finding made in an action in ejectment that plaintiff and other witnesses swore falsely at the trial of a contest in the federal land office over the land in question in the ejectment suit, is *immaterial,*

since in order to justify a court in interfering with a conclusion reached by that department, the fraud in respect to which relief was sought by defendant by way of equitable counterclaim, must have been extrinsic and collateral to the matter tried by it and not in a matter tried upon its merits and upon which the decision was rendered.

Public Lands—Settlement—Noncompliance with Law—Who may Complain.
6.    Where the federal government is willing that one who obtained land from the public domain without strict compliance with the law and the rules of the Land Department, should retain it, the individual citizen has no right to complain.

*Appeal from District Court, Yellowstone County; C. H. Loud, Judge.*

ACTION by Catherine Kennedy, administratrix of the estate of Edward B. Kennedy, deceased, against William Dickie. From a judgment in favor of defendant, plaintiff appeals. Reversed and remanded.

*Mr. C. L. Harris,* for Respondent.

When the government has parted with title to lands, and the party to whom it is awarded obtains the same against the rights of another by fraud and imposition, or where the officers of the Land Department when passing upon the rights of individuals to government land misconstrue the law applicable to the controversy, or misapply the law to the facts as found by them, courts will review the same and do justice to the parties. Courts also review the action and decision of the officers of the Land Department, where one party claims another obtained the land by false testimony; in such case (if that is all the wrong complained of), it must appear that the alleged false testimony was considered by such officers; that it influenced them in making the decision complained of; that the decision complained of is based upon such false testimony. In all other cases the decisions of the officers of the Land Department are final and cannot be reviewed by the courts. (*Johnson* v. *Towsley,* 80 U. S. (13 Wall.) 72, 20 L. Ed. 485; *Bohall* v. *Dilla,* 114 U. S. 47, 5 Sup. Ct. 782, 29 L. Ed. 61; *Quinby* v. *Conlan,* 104 U. S. 420, 26 L. Ed. 800; *Quinn* v. *Chapman,* 111 U. S. 445, 4 Sup. Ct. 508, 28 L. Ed. 476; *Sampson* v. *Smiley,* 80 U. S. (13 Wall.) 91, 20 L. Ed. 489;

*Vance* v. *Burbank,* 101 U. S. 514, 25 L. Ed. 929; *Lee* v. *Johnson,* 116 U. S. 48, 6 Sup. Ct. 249, 29 L. Ed. 570; *St. Louis Smelting Co.* v. *Kemp,* 104 U. S. 636, 26 L. Ed. 875; *Thornton* v. *Peery,* 7 Okla. 441, 54 Pac. 649; *Bertwell* v. *Haines,* 10 Okla. 469, 63 Pac. 702; *Estees* v. *Timmons,* 12 Okla. 537, 73 Pac. 303; *Jordan* v. *Smith,* 12 Okla. 703, 73 Pac. 308; *Baldwin* v. *Keith,* 13 Okla. 624, 75 Pac. 1124; *Wormouth* v. *Gardner,* 112 Cal. 506, 44 Pac. 806.) This court practically settled the law of this state in *Colburn* v. *Northern Pac. Ry. Co.,* 13 Mont. 476, 34 Pac. 1017; *Small* v. *Rakestraw,* 28 Mont. 413, 104 Am. St. Rep. 691, 72 Pac. 746; *Gebo* v. *Clark's Fork Coal Min. Co.,* 30 Mont. 87, 75 Pac. 859; *Murray* v. *Montana L. & M. Co.,* 25 Mont. 14, 20, 21, 63 Pac. 719; *Horsky* v. *Moran,* 21 Mont. 345, 53 Pac. 1064; *Power* v. *Sla,* 24 Mont. 243, 61 Pac. 468.

The purchaser of a relinquishment acquires no right to the land, or any interest therein. No settlement rights are vested in the purchase of a relinquishment, whether it be that of an Indian or other person. (*Andrew Korbe,* 2 Land Dec. 133; *Wiley* v. *Raymond,* 6 Land Dec. 246; *Davis J. Davis,* 7 Land Dec. 560; *Gilmore* v. *Schriner,* 9 Land Dec. 269; *Bentley* v. *Bartlett,* 15 Land Dec. 179; *Tabot* v. *Ortin,* 15 Land Dec. 441; *Stone* v. *Cowles,* 13 Land Dec. 192; *Zaspell* v. *Nolan,* 13 Land Dec. 148; *Fosgate* v. *Bell,* 14 Land Dec. 439; *Neil* v. *Southard,* 16 Land Dec. 386; *Cullins* v. *Leonard,* 17 Land Dec. 412; *Etnier* v. *Zook,* 11 Land Dec. 452.)

It is a fundamental rule that land is not subject to filing or entry "until it has been surveyed and the plat thereof duly filed in the local land office." (*Helen M. Cameron,* 10 Land Dec. 195; *Allen* v. *Merrill,* 8 Land Dec. 221-207.) It has been said: "Ordinarily, the public lands are not deemed surveyed in contemplation of law until the survey is approved and becomes a record in the district land office." (*Lord* v. *Perrin,* 8 Land Dec. 539, citing the case of *Barnard* v. *Ashley's Heirs,* 18 How. 46, 15 L. Ed. 285; *Hiram Brown,* 13 Land Dec. 392; *Johnson* v. *Jamerson,* 19 Land Dec. 91.) Plats are not deemed filed until the expiration of the thirty days' notice required by official regu-

lations. (*Johnson* v. *Jamerson,* 19 Land Dec. 91; *Benson* v. *State,* 24 Land Dec. 272.)

While an Indian allotment is not an entry, it, however, segregates the land. (*Lewis Eggert,* 5 Land Dec. 311.)

When a relinquishment is filed in the local land office, the land embraced in the entry is restored to the public domain. Not so with a relinquishment of an allotment. Relinquishment in such case does not become effective until approved by the department. (*Spaulding* v. *Kinney,* 27 Land Dec. 150; *Stephen Green,* 29 Land Dec. 680.)

The judgment of the lower court should be sustained upon the proposition that the land office officials misconstrued the law applicable to the contest between the parties to this action, and misapplied the same to the facts as by them found. The judgment of the lower court was not only based upon the findings of fact, but upon review of the law as considered by the land office officials in the determination of the contest between Dickie and Kennedy. The court found that said officials had misconstrued the law and misapplied the same to the facts as by them found. (*Bohall* v. *Dilla,* 114 U. S. 47, 5 Sup. Ct. 782, 29 L. Ed. 61; *Quinby* v. *Conlan,* 104 U. S. 420, 26 L. Ed. 800; *Johnson* v. *Towsley,* 80 U. S. (13 Wall.) 72, 20 L. Ed. 485; *Sampson* v. *Smiley,* 80 U. S. (13 Wall.), 91, 20 L. Ed. 469; *Quinn* v. *Chapman,* 111 U. S. 445, 4 Sup. Ct. 508, 28 L. Ed. 476; *Small* v. *Rakestraw,* 28 Mont. 413, 104 Am. St. Rep. 691, 72 Pac. 746; *Colburn* v. *Northern Pac. Ry. Co.,* 13 Mont. 476, 34 Pac. 1017; *Gebo* v. *Clark's Fork Coal Min. Co.,* 30 Mont. 87, 75 Pac. 859.)

*Messrs. Hathhorn & Groves,* for Appellant.

The officers of the Land Department are specially designated by law to receive, consider and pass upon proofs presented with respect to settlements upon the public land, with a view to secure rights of pre-emption. If they err in the construction of the law applicable to the case, or if fraud is practiced upon them, or they themselves are charged with fraudulent prac-

tices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties upon their decisions; but for mere errors of judgment upon the weight of the evidence in a contested case before them, the only remedy is by appeal from one officer to another of the department. The ruling of the department on disputed questions of fact, made in a contested case, must be taken when the ruling is collaterly assailed, as conclusive. (*Shepley* v. *Cowan,* 91 U. S. 330, 23 L. Ed. 424; *Johnson* v. *Towsley,* 13 Wall. 72, 20 L. Ed. 485; *Bagnell* v. *Broderick,* 13 Pet. 436, 10 L. Ed. 235; *Warren* v. *Van Brunt,* 19 Wall. 646, 22 L. Ed. 219; *Moore* v. *Robbins,* 96 U. S. 530, 24 L. Ed. 848; *Quinby* v. *Conlan,* 104 U. S. 420, 26 L. Ed. 800; *St. Louis Smelting Co.* v. *Kemp,* 104 U. S. 636, 26 L. Ed. 875; *United States* v. *Minor,* 114 U. S. 233, 5 Sup. Ct. 836, 29 L. Ed. 110; *Johnson* v. *Drew,* 171 U. S. 93, 18 Sup. Ct. 800, 43 L. Ed. 88; *Silver Bow Min. etc. Co.* v. *Clark,* 5 Mont. 378, 5 Pac. 580; *Colburn* v. *Northern Pac. Ry. Co.,* 13 Mont. 476, 34 Pac. 1017; *Moore* v. *Northern Pac. Ry. Co.,* 18 Mont. 290, 45 Pac. 215; *Horsky* v. *Moran,* 21 Mont. 345, 53 Pac. 1064; *Power* v. *Sla,* 24 Mont. 243, 61 Pac. 468; *Murray* v. *Montana Lumber Co.,* 25 Mont. 14, 63 Pac. 719.)

Consent of the Secretary of Interior to a relinquishment by an Indian of his allotment, when given, is retroactive in its effect, and relates back to the date of relinquishment. (*Lykins* v. *McGrath,* 184 U. S. 169, 22 Sup. Ct. 450, 46 L. Ed. 485; *Pickering* v. *Lomax,* 145 U. S. 310, 12 Sup. Ct. 860, 36 L. Ed. 716.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

Ejectment. The purpose of the action is to recover the possession of the northwest quarter of the northwest quarter of section 35, and lot 5 of section 34, township 1 north of range 26 east of the principal meridian of Montana, situate in Yellowstone county.

The complaint is in the ordinary form, alleging title and right of possession in plaintiff and ouster by the defendant. After the action was commenced the plaintiff, E. B. Kennedy, died. The present plaintiff, his widow, was thereupon substituted as plaintiff in his stead. The answer admits that the said Kennedy was prior to his death vested with the legal title to the land in controversy, but alleges that he became so vested with the title by a patent from the United States government, in fraud of defendant's rights, and that defendant is the lawful owner and entitled to the possession thereof. It denies the ouster. It then proceeds to allege two equitable counterclaims, which set forth in detail the history of a contest between E. B. Kennedy, the deceased, and the defendant before the Land Department of the United States, which resulted in a decision that the former was entitled to a patent by virtue of his priority of settlement upon the lands in controversy, with others, as his homestead. The first alleges, in substance, that this decision was obtained by fraud, in that, though defendant was the prior settler, Kennedy entered into a conspiracy with one Steele and others for the purpose of defeating defendant's claim, and succeeded in accomplishing his purpose by use of false and perjured testimony to the effect that he himself was the prior settler, and by preventing the defendant from fully and fairly presenting his claim to the department, whereas in fact the defendant was the prior settler and, but for the wrongful conduct of plaintiff, would have been awarded patent. The second, referring to and adopting the allegations contained in the first and detailing the facts found by the officers of the Land Department, avers that these officers misconstrued the law applicable thereto, and awarded the patent to Kennedy, whereas upon a proper investigation and application of the law it should have been awarded to the defendant. It is demanded that the court decree plaintiff involuntary trustee of the legal title for defendant's benefit, and that she be compelled to execute to him a suitable conveyance.

The trial was had upon the issues presented by plaintiff's reply to these counterclaims, denying all the material allegations therein, and resulted in findings and a judgment in favor of the defendant. Plaintiff has appealed from the judgment and an order denying her motion for a new trial.

The following facts are gathered from the record: Prior to 1892, the lands in controversy were included in the Crow Indian reservation. On December 8, 1890, under authority of an Act of Congress approved September 25, 1890 (26 Statutes at Large, 468, c. 913), a treaty was negotiated with the Crow Indians, by the terms of which a portion of their reservation, including a part of the land in controversy, was ceded to the government. Among other exceptions provided for under the treaty, were allotments theretofore made to Indians in severalty, and selections made by any of them under prior treaties. The treaty was ratified by Congress by an Act approved March 3, 1891 (26 Statutes at Large, 989, c. 543). By subsequent negotiations this treaty was modified under authority of an Act of Congress approved July 13, 1892 (27 Statutes at Large, 121, c. 164). Thereupon the President by proclamation, on October 15, 1892 (27 Statutes at Large, 1034), declared that all lands ceded under the treaty were open to settlement, subject to the conditions, limitations, and reservations in section 34 of the Act of Congress approved March 3, 1891, and other laws applicable.

The plat of the township survey was filed in the local land office at Bozeman on August 7, 1895, and notice was published that entries could be made by homestead settlers after September 8, 1895. Prior to this time and on July 1, 1895, Kennedy made application to the land office at Bozeman to enter as a homestead lot 5, section 34, the north half of the northwest quarter of section 35, lot 7, and the southeast quarter of the southwest quarter of section 26, township 1 north, range 26 east. This application was not received because the plat of the survey had not then been filed in the office. All the land described in his application, except the north half of the

northwest quarter of section 35, had theretofore been allotted to· a Crow Indian named High Nose. The application was accompanied by a relinquishment by High Nose, dated June 26, 1895, of his claim thereto. It had been approved by the local agent but not by the Interior Department. It was approved by the latter on October 12, 1895. Kennedy left his application in the office to be filed as soon as the plat should be received, paying the receiver the necessary fees. On September 9, 1895, Kennedy's entry was filed and allowed. On the following day the defendant made application covering the land in controversy. He found that he could not make the entry as to the conflicting portion, since this was covered by the entry of Kennedy. He thereupon filed contest as to this portion of Kennedy's entry, claiming priority of settlement.

Defendant contended at the hearing of the contest that he had settled on the northwest quarter of the northwest quarter of section 35, by erecting a tent thereon on April 27, 1895, and building a fence inclosing a part of this subdivision and also of lot 5 in section 26. He further contended that he had removed his family thereon on May 27th and that thereafter he had made his home there, having erected a dwelling and necessary outhouses. Kennedy's contention was that his first act of settlement was the erection of a tent on the northwest quarter of the northwest quarter of section 35, on May 24, 1895, and cleaning a portion of the surface, and that this was followed by the erection of a dwelling on the line between the northwest quarter of the northwest quarter and lot 5, into which he moved his family on May 29th and 30th where he had since resided. He further contended that his purchase of the ᴑrelinquishment of the Indian, High Nose, gave him priority of right over the defendant. As to the alleged settlement of the defendant, E. B. Kennedy further contended that the defendant went upon the land not as a settler, or with the intention of acquiring title by homestead entry, but under an agreement with the Indian, High Nose, and another by the name of Rivers, who had allotments in other portions of sec-

tion 26, under the terms of which he was to cultivate a portion of the land in both allotments and cut hay from other portions thereof, one-half of the product to be given to the Indians as consideration for his occupancy of their land. It was alleged that he built no new inclosure but merely repaired an old fence theretofore built by the Indians to protect their lands from the inroads of range stock, a portion of it having been put on the northwest quarter of the northwest quarter of section 35, because the division lines were not known.

On January 20, 1896, the local officers at Bozeman found that the defendant's first act of settlement was on May 27th. They sustained plaintiff's contention and dismissed the contest. The defendant then appealed to the commissioner of the land office at Washington. That officer, in an opinion dated November 30, 1896, after a review of the evidence, affirmed the decision of the local officers. On appeal to the Secretary of the Interior the decision was again affirmed. A subsequent application for a rehearing was denied. The commissioner on his review of the case found that the plaintiff was the prior settler and that he had the equities in his favor by reason of his purchase of the allotment of High Nose. At the hearing before the Secretary of the Interior, besides going into the whole case on the facts, the defendant contended that E. B. Kennedy's entry was void as to lot 5, section 34, because it was not open to settlement until the relinquishment of High Nose had been approved by the Interior Department, and as to the northwest quarter of the northwest quarter of section 35, because it had been made upon papers executed before any of the lands were subject to entry, and because the land included in the entry was in excess of one hundred and sixty acres. The Secretary affirmed the finding of the inferior officers that E. B. Kennedy was the prior settler on the northwest quarter of the northwest quarter of section 35, the portion not included in the High Nose allotment. Upon the questions of law presented by the contentions of the defendant, he held (1) that, as to the allotted land, though the entry was irregular, it was

under the circumstances not void; (2) that, though irregular, it was not void because made upon papers executed prior to the time entry could have been made, but was amendable so as to make it good; and (3) that it was not void because it covered more than one hundred and sixty acres.

These contentions, in the opinion of the Secretary, presented questions which the government only could raise and which could not be effectually urged by defendant, whose rights under his alleged settlement were inferior to those of Kennedy. As to the portion of the land embraced within the allotment of High Nose the conclusion was that both Kennedy and defendant were trespassers, but that defendant stood in no position to question the validity of E. B. Kennedy's settlement because made prior to the time the relinquishment became operative.

The evidence introduced at the trial in the district court consisted of a copy of the evidence submitted at the contest in the land office, supplemented by such other evidence of a cumulative and impeaching character as the parties could procure. Indeed, it was in the nature of a rehearing of the contest and differed in nowise from what it would have been had it taken place before the Land Department officers.

The district court found (1) that E. B. Kennedy prevented the defendant from producing one Shock as a witness and having his evidence heard at the contest in the land office; (2) that Kennedy caused one Warren Burton to be imprisoned during November, 1895, so that his evidence could not be obtained and used by the defendant; (3) that he likewise caused one John Miller to be imprisoned with a like result; (4) that Kennedy conspired with one Steele, the reservation farmer, and other persons, to defraud defendant of the land in controversy; (5) that Kennedy gave false testimony at the contest, in that he swore that the Indian, High Nose, was dead so that he could not produce him to corroborate his (Kennedy's) statement as to defendant's arrangement with High Nose and Rivers under which he entered upon the land, and as to his repair of the fence thereon; (6) that there was in

fact no fence on the land when defendant first occupied it; (7) that defendant did not enter upon the land or build any fence thereon or cultivate any portion thereof under agreement with High Nose and Rivers; (8) that defendant took up his residence on the land on May 27, 1895; (9) that E. B. Kennedy was not at that time residing on any part of the land and did not enter thereon at any time prior to May 29, 1895; (10) that patent was issued to Kennedy on March 17, 1903; (11) that defendant had resided continuously upon the northwest quarter of the northwest quarter of section 35, and a portion of lot 5, section 34, and cultivated portions of both from year to year; (12) that George A. Miller, Clarence Kirk, Lionel I. Hammond, Henry Heise, and Joseph Ziminski, Jr., examined as witnesses at the contest, had given false testimony in behalf of E. B. Kennedy before the officers at Bozeman and (13) that this false testimony and other testimony found to be false at the trial in the district court, influenced and controlled the officers of the Land Department in making their decision.

As conclusions of law the court held: (1) That E. B. Kennedy's entry, made upon papers executed on July 1, 1895, was void; (2) that the purchase of the allotment of High Nose by E. B. Kennedy gave him no preferential right of settlement; (3) that as to lot 5 of section 34, both E. B. Kennedy and the defendant were trespassers up to October 14, 1895, the date at which the relinquishment of High Nose became operative, since the said relinquishment was ineffective until approved by the Secretary of the Interior; (4) that, since the defendant was the prior legal settler, the officers of the Land Department misconstrued and misapplied the law to the facts found by them; (5) that E. B. Kennedy, at the time of his death, was holding the title to lot 5, section 34, and the northwest quarter of the northwest quarter of section 35, as involuntary trustee of the defendant, and that the plaintiff, his administratrix, was holding the same as his successor as such involuntary trustee; and (6) that the defendant was entitled

to a judgment requiring the plaintiff as administratrix of E. B. Kennedy, deceased, to convey to the defendant by deed the legal title to the land so described, upon his payment into court for the use and benefit of the estate of E. B. Kennedy, the reasonable value of the improvements placed by Kennedy on the lands, and upon his further payment for the same purpose of the sums of money paid by said Kennedy in making his entry and final proof for patent. These sums having been ascertained under a reference ordered for that purpose and paid into court, judgment was entered as heretofore stated in favor of defendant. Though requested to do so, the court refused to find that Kennedy procured any person or persons to give false testimony in his behalf at the hearing of the contest, or that Kennedy or his agents in any manner prevented defendant from fully presenting his case at said hearing.

The questions submitted for decision are: 1. Does the evidence justify findings 1, 2, 3, and 4; 2. Can the judgment be sustained upon the other findings of fact made by the court; and 3. Did the officers of the Land Department misconstrue and misapply the law to the facts found by them?

1. A careful examination of the record fails to reveal any substantial evidence to support the first four findings. The witness Shock was taken from Billings, Yellowstone county, near where the land in controversy lies, to Bozeman by Kennedy to testify in his behalf as to the fact of the existence of the Indian fence and its condition at the time of the defendant's alleged settlement. Upon inquiry of him, Kennedy found that he would not testify as it was thought. He thereupon paid him his expenses and sent him back to Billings, telling him that he did not want defendant to get hold of him. There is nothing to show that the defendant at that time knew anything of Shock, or what he would state, or that he could not have had his testimony had he so desired. Kennedy used no improper influence upon the witness. Unless it be the law that one party to a controversy is bound to discover witnesses to his adversary to his own detriment, then Kennedy did no

wrong in paying this witness and discharging him. We hold that Kennedy was in no wise bound to discover the existence of Shock, or to reveal to the defendant what Shock would testify to. At such hearings witnesses appear, if at all, voluntarily at the request of the party who pays their expenses. Kennedy was not required to use his influence to detain this or any other witness, or to pay his expenses for the advantage of the defendant.

After the contest arose, Burton and Miller were arrested by the federal authorities at the instance of Steele, the reservation farmer, for trespassing upon the reservation. They were committed for trial in the United States court at Helena. Both were indicted by a grand jury. Upon a trial Burton was convicted and fined, but Miller was acquitted. Both were in jail at Helena at the time of the hearing at Bozeman. Assuming that the evidence could not have been obtained by deposition, and that the defendant was not guilty of negligence in failing to procure it, there is nothing to show that Kennedy instigated their arrest or that the motive actuating Steele in procuring it was to aid Kennedy. Kennedy and Steele were intimate. Both were witnesses at the trial of Burton and Miller, as well as at the trial of the contest. But this fact, standing alone, furnishes no substantial ground for a finding that the two were engaged in a criminal conspiracy to procure a conviction of these witnesses and thus prevent the defendant from using their evidence. If it be a fact that they entered into and were partially successful in carrying out such a conspiracy, it was not established by anything in this record.

The same may be said of the fourth finding. Beyond the fact that Steele and Kennedy were friendly, and that Steele aided Kennedy in any way he could to establish his claim, there is no substantial proof that they expressly or impliedly agreed to defraud the defendant. While it does appear that Steele, at the instance of Kennedy, removed other persons from portions of the allotted land, he did not remove the defendant from his alleged claim, even though defendant was himself from

the time he made his settlement, according to his own admission, a trespasser upon lot 5 in section 34.

2. The remaining findings are, in our opinion, wholly immaterial. The court finds that Kennedy and the other witnesses named swore falsely at the trial of the contest, Kennedy as to the death of High Nose, and the other witnesses, as appears from an examination of their testimony, as to the arrangement between the defendant and the Indians High Nose and Rivers, and as to the ownership and character of the fence which defendant claims that he built as a part of his improvements.

The Land Department of the federal government is the tribunal specially designated by law to receive and consider the evidence and thereupon determine the rights growing out of settlements upon public lands, with a purpose to secure them to those who have complied with the laws regulating the disposition of them. If its officers err in the interpretation of the law applicable to the facts presented, or a fraud is practiced by one rival claimant upon the other by which the latter is deprived of his right, or if the officers themselves are chargeable with fraudulent practices which have resulted in their granting title to the wrong party, their action may be reviewed and annulled by a court of equity at the instance of the aggrieved claimant, and the wrongful holder of the title may be compelled to surrender it. But for mere errors of judgment upon the weight of the evidence produced before them in any case, the only remedy is by appeal from one officer to another of the department. Upon such questions their rulings are final and conclusive upon all courts whatsoever. These fundamental rules have been settled by many decisions of the supreme court of the United States and have frequently been recognized and applied by this court. (*Bagnell* v. *Broderick*, 13 Pet. (U. S.) 436, 10 L. Ed. 235; *Johnson* v. *Towsley*, 13 Wall. (U. S.) 72, 20 L. Ed. 485; *St. Louis Smelting Co.* v. *Kemp*, 104 U. S. 636, 26 L. Ed. 875; *Shepley* v. *Cowan*, 91 U. S. 340, 23 L. Ed. 424; *Quinby* v. *Conlan*, 104 U. S. 420, 26 L. Ed. 800; *Silver Bow M. & M. Co.* v. *Clark*, 5 Mont. 378, 5 Pac. 570; *Colburn* v. *Northern Pac. R. R.*

*Co.*, 13 Mont. 476, 34 Pac. 1017; *Moore* v. *Northern Pac. R. R. Co.*, 18 Mont. 290, 45 Pac. 215; *Power* v. *Sla*, 24 Mont. 243, 61 Pac. 468; *Small* v. *Rakestraw*, 28 Mont. 413, 104 Am. St. Rep. 691, 72 Pac. 746.)

It is also as well settled by the adjudicated cases and text-writers that the fraud in respect to which relief will be granted in any case must have been practiced upon the unsuccessful party, with the result that he has been prevented from fully and fairly presenting his case for consideration. In short, the situation in the case must have been such that there has never been a decision in a real contest over the matter in controversy. The fraud must have been extrinsic and collateral to the matter tried by the department, and not in a matter tried upon its merits and upon which the decision was rendered. (*United States* v. *Throckmorton*, 98 U. S. 61, 25 L. Ed. 93; *Vance* v. *Burbank*, 101 U. S. 514, 25 L. Ed. 929; *Lee* v. *Johnson*, 116 U. S. 48, 6 Sup. Ct. 249, 29 L. Ed. 570; *Thornton* v. *Peery*, 7 Okla. 441, 54 Pac. 649; *Cagle* v. *Dunham*, 14 Okla. 610, 78 Pac. 561.)

*United States* v. *Throckmorton, supra,* was a suit brought to set aside and declare void a confirmation by the board of land commissioners of private land claims of California, of a claim of one Richardson under a Mexican grant. The ground of the action was that the decision of the board had been obtained by fraud. The specific fraud alleged was that Richardson had obtained from Micheltorena, the former political chief of California under the Mexican government, a grant to the lands in controversy falsely and fraudulently antedated so as to impose on the commissioners the belief that it had been made at a time when Micheltorena had power to make it. It was alleged that perjured depositions were procured and filed along with the fraudulent grant. The court, in deciding the case, adopted the view, and correctly we think, that cases arising out of controversies over public lands and involving the validity of determinations of the officers of the Land Department, are governed by the principles applicable to ordinary suits in equity brought

to set aside judgments obtained by fraud. It states the general rule thus:

"If the court has been mistaken in the law, there is a remedy by writ of error. If the jury has been mistaken in the facts, there is the same remedy by motion for new trial. If there has been evidence discovered since the trial, a motion for a new trial will give appropriate relief. But all these are parts of the same proceeding, relief is given in the same suit, and the party is not vexed by another suit for the same matter. So, in a suit in chancery, on proper showing, a rehearing is granted. If the injury complained of is an erroneous decision, an appeal to a higher court gives opportunity to correct the error. If new evidence is discovered after the decree has become final, a bill of review on that ground may be filed within the rules prescribed by law on that subject. Here, again, these proceedings are all part of the same suit, and the rule framed for the repose of society (*interest reipublicae ut sit finis litium*) is not violated. But there is an admitted exception to this general rule, in cases where, by reason of something done by the successful party to a suit, there was, in fact, no adversary trial or decision of the issue in the case. Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, (by) a false promise of a compromise, or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side—these and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing. * * * On the other hand, the doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudulent instrument, or perjured evi-

dence, or for any matter which was actually presented and considered in the judgment assailed.''

In *Vance* v. *Burbank, supra,* it is said in the same connection: ''The appropriate officers of the Land Department have been constituted a special tribunal to decide such questions, and their decisions are final to the same extent that those of other judicial or quasi judicial tribunals are. It has also been settled that the fraud in respect to which relief will be granted in this class of cases must be such as has been practiced on the unsuccessful party and prevented him from exhibiting his case fully to the department, so that it may properly be said that there has never been a decision in a real contest about the subject matter of inquiry. False testimony or forged documents even are not enough, if the disputed matter has actually been presented to or considered by the appropriate tribunal.''

Again, in *Quinby* v. *Conlan, supra,* the court through Mr. Justice Field said: ''For mere errors of judgment, as to the weight of evidence on these subjects, by any of the subordinate officers, the only remedy is by an appeal to his superior of the department. The courts cannot exercise any direct appellate jurisdiction over the rulings of those officers, or of their superior in the department in such matters, nor can they reverse or correct them in a collateral proceeding between private parties. In this case the allegation that false and fraudulent representations, as to the settlement of the plaintiff, were made to the officers of the Land Department, is negatived by the finding of the court. It would lead to endless litigation and be fruitful of evil if a supervisory power were vested in the courts over the action of the numerous officers of the Land Department, on mere questions of fact presented for their determination. It is only when those officers have misconstrued the law applicable to the case, as established before the department, and thus have denied to parties rights which, upon a correct construction, would have been conceded to them, or where misrepresentations and fraud have been practiced, necessarily affecting their judgment, that the courts can,

in proper proceeding, interfere and refuse to give effect to their action. On this subject we have repeatedly and with emphasis expressed our opinion, and the matter should be deemed settled. * *. * And we may also add in this connection, that the misconstruction of the law by the officers of the department, which will authorize the interference of the court, must be clearly manifest, and not alleged upon a possible finding of the facts from the evidence different from that reached by them.''

The rule applicable is thus stated by Mr. Herman in his work on Estoppel and Res Judicata: ''Sec. 395. In every litigated case where the interests involved are large there is generally conflicting evidence. Witnesses looking at the same transaction from different standpoints give different accounts of it. The statements of some are unconsciously affected by their wishes, hopes or prejudices. Some, from defective recollection, will blend what they themselves saw or heard with what they have received from the narration of others. Uncertainty as to the truth in a contested case will thus arise from the imperfection of human testimony. In addition to this source of uncertainty may be added the possibility of the perjury of witnesses and the fabrication of documents. The cupidity of some and the corruption of others may lead to the use of the culpable means of gaining a cause. But every litigant enters upon the trial of a cause knowing not merely the uncertainty of human testimony when honestly given, but that, if he has an unscrupulous antagonist, he may have to encounter fraud of this character. He takes the chances of establishing his case by opposing testimony, and by subjecting his opponent's witnesses to the scrutiny of a certain cross-examination. The case is not the less tried on its merits, and the judgment rendered is none the less conclusive, by reason of the false testimony produced. Thus, if an action be brought upon a promissory note, and issue be joined on its execution, and judgment go for the plaintiff, and there is no appeal, or if an appeal be taken and the judgment be affirmed, the judgment is conclusive between the parties, although, in fact, the note

may have been forged, and the witnesses who proved its execution may have committed perjury in their testimony. The rules of evidence, the cross-examination of witnesses, and the fear of criminal prosecution with the production of counter-testimony, constitute the only security afforded by law to litigants in such cases. A court of equity could not afterward interfere upon an allegation of the forgery and false testimony, for that would be to reopen the case to a trial upon the execution of the note, which had already been *sub judice* and passed into judgment.'' The following cases illustrate application of the rule: *Kent* v. *Ricards,* 3 Md. Ch. 392; *Wierich* v. *De Zoya,* 2 Gilm. (Ill.) 385; *De Louis* v. *Meek,* 2 G. Greene (Iowa), 55, 50 Am. Dec. 491; *Pearce* v. *Olney,* 20 Conn. 543; *Smith* v. *Lowry,* 1 Johns. Ch. (N. Y.) 320; *Ross* v. *Wood,* 70 N. Y. 8; *Pico* v. *Cohn,* 91 Cal. 129, 25 Am. St. Rep. 159, 25 Pac. 970, 27 Pac. 537, 13 L. R. A. 336. (See, also, Hukm Chand on Res Judicata, sec. 489 et seq.)

In the case at bar the fraud upon which the court permitted the defendant to recover is inferred from the fact that false testimony was given at the contest as to the character of the defendant's entry upon the land in controversy. As we have seen from an examination of the cases cited, this is not such fraud as will justify the interference of a court of equity. The possibility of the presence of perjury at any controversy in courts is always to be anticipated, and when a party is awarded a trial, he must be prepared to meet and expose it then and there. The very object of the trial is to ascertain the truth from conflicting evidence, and necessarily the result of the investigation is a determination of the truth or falsity of the story of every witness who has testified. The trial is the complaining party's opportunity to make the truth appear, and if he fails, being overborne by perjured testimony, he is unfortunate but nevertheless without remedy. (*Pico* v. *Cohn, supra.*) This seems to be a harsh rule, but any other would promote endless litigation and open the door to even greater fraud by encouraging litigants to attempt to set aside judgments after the evidence upon which

they rest has been destroyed or lost by lapse of time. The cases of *Pico* v. *Cohn, Smith* v. *Lowry* and *Ross* v. *Wood, supra,* are directly in point and we think state the correct rule.

Under the rule established by the authorities, although the finding that Kennedy and his witnesses swore falsely at the contest at Bozeman be ever so well established by the proof, nevertheless it is wholly immaterial and does not warrant the judgment of the district court. Nor does the fact that the court found upon the evidence that the settlement of defendant was prior to that of Kennedy.

But, conceding the rule to be that a judgment may be overturned on the ground alleged, the allegations and proofs offered must be something more than a mere rehearing upon substantially the same case submitted at the hearing which resulted in the judgment complained of. Here nothing is presented for determination other than the question decided by the Land Department, to-wit: the truth of the statements of the witnesses who testified at the hearing. It is true that some additional witnesses testified in the district court, but their testimony was entirely cumulative and impeaching in character, and upon this feature of the case the findings and judgment of the district court are the result of a different conclusion reached upon practically the same facts submitted to the Land Department. Said Mr. Justice Field in *Lee* v. *Johnson, supra:* "A judicial inquiry as to the correctness of such conclusions would encroach upon a jurisdiction which Congress has devolved exclusively upon the department. It is only when fraud and imposition have prevented the unsuccessful party in a contest from fully presenting his case, or the officers from fully considering it, that a court will look into the evidence."

3. Nor do we think that the officers of the Land Department misconstrued or misapplied the law to the facts found by them. The determinative fact found was the priority of Kennedy's settlement. So far as concerns his entry upon the northwest quarter of the northwest quarter of section 35, it was lawful. The finding that he was there first was binding upon the district

court, even though, if the matter had been submitted as an original question, that court might have found otherwise, as it did. This fact having been established, the decision of the department that the record entry made at the land office was not void but amendable, did not prejudice the defendant in any way, for it did not deprive him of any right. Under the circumstances he had no right of entry, and the condition of the record was for this reason a question solely for the government, and if these officers wrongly decided it, this fact furnished no ground for complaint by defendant. The individual citizen has no right to complain if the government is willing that Kennedy's heirs retain the land which he obtained without strict compliance with the law and the rules of the department. Nor does it matter that the entry was not in fact amended by the local officers, as was suggested by the Secretary of the Interior in his opinion.

For the same reason the defendant cannot complain of the decision that the entry was not void for that Kennedy was a trespasser upon lot 5, section 34, or that he had superior equities by reason of his purchase of the High Nose allotment. Whether this latter conclusion was reached by ignoring the trespass or upon the theory that his occupancy of the allotment, originally wrongful, was made good from its inception by relation, by the approval and recognition of the relinquishment on October 14, 1895, it furnishes the defendant no ground to complain. In any event, if Kennedy's occupancy of lot 5, section 34, was wrongful, the defendant cannot be heard to say that his alleged occupancy was of any higher character. But however this may be, the disposition of this matter was for the government, and defendant has no ground to complain that an oversight on the part of the officers of the government deprived him of any right, when, as a matter of fact, he had no right.

The district court, we think, was in error in deciding the case as it did. At the close of defendant's evidence the plaintiff requested the court to find in her favor. This it should have done,

since the defendant did not make out a case upon which he was entitled to recover.

The judgment and order are, therefore, reversed, and the cause is remanded to be proceeded with in accordance with the suggestions herein.

*Reversed and remanded.*

MR. JUSTICE HOLLOWAY concurs.

MR. JUSTICE MILBURN, not having been present at the argument, takes no part in this decision.

Rehearing denied, June 16, 1906.