PAUL F. DEICH, Plaintiff and Appellant v. LOUISE BELLE DEICH, Defendant and Respondent.

No. 9715.
Submitted January 22, 1958. Decided March 17, 1958.
Rehearing denied March 31, 1958.
323 Pac. (2d) 35.

568

Paul W. Smith, David R. Smith, J. Miller Smith and Chadwick H. Smith, Helena, for appellant. J. Miller Smith argued orally for appellant.

Myles J. Thomas, Helena, for respondent, and argued orally for respondent.

HONORABLE JAMES T. SHEA, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, delivered the Opinion of the Court.

Appeal from a judgment and decree given, made, rendered and entered in department No. 1 of the district court of the first judicial district of the State of Montana, whereby, and by reason of which, a decree of divorce given, made, rendered and entered in department No. 2 of the court was declared null, void and of no force or effect and that the same be set aside and the record purged thereof. At the time of the making and entry of the decrees, the Honorable George W. Padbury, Jr., was the judge who presided over department No. 1, and the Honorable Victor H. Fall was the judge who presided over department No. 2. Further, by a rule of court, all civil cases bearing an odd number were assigned to department No. 1 and all even numbered cases were assigned to department No. 2. The transcript on appeal herein designates the instant case in the court below as No. 25137. Therefore, the case bearing an odd number was properly assignable to department No. 1, presided over by Judge Padbury.

The Facts: Paul F. Deich and Louise Belle Deich were married at Butte, Montana, on August 4, 1942. No children were

born of this union. On July 12, 1955, Mr. Deich commenced an action in the district court of Lewis and Clark County to secure an absolute decree of divorce on the ground of desertion. Mrs. Deich, by and through her self-appointed attorney, William A. Brown, Esq., interposed a general demurrer to plaintiff's complaint and when it was overruled she declined to plead further. Her default was entered, and on July 12, 1955, the court heard the evidence offered by the plaintiff and a decree of divorce was rendered and entered in conformity with the complaint. No appeal was taken from this decree. Thereafter, and on September 7, 1955, the plaintiff, Paul E. Deich, passed away. On December 16, 1955, the defendant moved the court to vacate the decree upon the grounds of fraud upon the part of plaintiff, the collusion of defendant and plaintiff, and the mistake, inadvertence, surprise and excusable neglect of defendant. The motion set forth that it was based upon the records and files in the cause, defendant's affidavit of merits filed contemporaneously with the motion and oral testimony to be adduced at the hearing of the motion. It will be observed the motion to vacate the decree of divorce was filed five months and four days after the decree was rendered and entered. The affidavit of merits referred to in the motion as being filed contemporaneously therewith was not so filed. It was sworn to by defendant before a Notary Public in Seattle, Washington, on December 22, 1955, and filed in the cause on December 27, 1955, or five months and fifteen days after the decree of divorce was rendered and entered. Prior to the filing of this affidavit, Judge Padbury, pursuant to order signed by him on December 16, 1955, set the motion for hearing on January 24, 1956. The affidavit of merits, though filed after the order setting the motion for hearing, for the purposes of this appeal, will be treated as having been filed on time and contemporaneously with the filing of the motion. Appearance on behalf of the deceased defendant was made by the administrator of his estate by filing objections to granting the motion.

The hearing upon the motion, though set to be heard on January 24, 1956, was not heard until February 3, 1956. At that time oral testimony, over the administrator's objection, was offered in support of the averments contained in defendant's affidavit of merits. At the conclusion of the hearing Judge Padbury took the matter under advisement and thereafter made and adopted findings of fact and conclusions of law and then rendered a judgment and decree declaring null and void the decree of divorce. This appeal followed.

The appellant has assigned fourteen specifications of error. Some of them raise the question of the jurisdiction of department No. 1, presided over by Judge Padbury, to annul and declare void a decree of divorce granted in department No. 2, presided over by Judge Fall.

"The district courts shall have original jurisdiction in all cases at law and in equity * * * of actions of divorce and for annulment of marriage * * *" Article VIII, section 11, Constitution of the State of Montana. "The state shall be divided into judicial districts * * *" Id. section 12. "The legislative assembly may increase or decrease the number of judges in any judicial district * * *" Id. section 14.

Under the constitutional provisions referred to, the district court had original jurisdiction of the instant action. Also, and pursuant thereto, by legislation subsequently enacted, it was provided that there should be two judges in the first judicial district. R.C.M. 1947, section 93-302.

Under the provisions of section 93-321, R.C.M. 1947, and the legislative history thereunder, it was provided that judges elected or appointed to hold office in each judicial district, having more than one judge, may divide the court into departments, prescribe the order of business, and make rules for the government of such court. It was further provided they must apportion the business of the court among themselves equally as may be, but in case of their failure to make such apportionment for any cause, the supreme court, upon application of any

interested person, shall make an order apportioning such business. This statute constituted an amendment of section 6278 of the Revised Codes of 1907. The amendment was the result of a controversy between the judges of the first judicial district by virtue of proceedings had in the case of State ex rel. Little v. District Court, 49 Mont. 158, 141 Pac. 151.

Pursuant to the law as amended, members of the Helena Bar Association petitioned the supreme court to make rules apportioning the business between the departments of the district court of the first judicial district. This the supreme court did and assigned all civil actions, including appeals in civil actions from justice of the peace courts, and all civil proceedings of a civil nature to be heard in department No. 1; all probate matters, insanity inquests, juvenile matters, all criminal actions, including appeals in criminal actions, in justice of the peace courts, and all special proceedings of a criminal nature were to be heard in department No. 2.

Later, and on September 13, 1915, the judges of the first judicial district petitioned the supreme court for an amendment to their rules assigning and apportioning the business between the departments, requesting that rule 2 be amended to read:

"All civil and criminal actions and proceedings bearing an even number shall be assigned to department 2 of said court; and all civil and criminal actions and proceedings bearing an odd number shall be assigned to department 1 of said court; all probate matters and insanity inquests may be heard and transacted in either department and all juvenile matters are assigned to department 2. The judges, however, may at any time, by an order entered on the minutes of the department to which any cause may have been originally assigned, reassign any such cause to the other department, whenever the convenient dispatch of business shall so require. Any cause or causes ready for trial in any department may be transferred by the presiding judge of such department to the judge of the other

department to be by him disposed of if he be not otherwise engaged; such transfer is only for the convenient dispatch of business and does not transfer the case from the department to which it was assigned; nor is it intended in any manner to interfere with the order of business in any department, nor to permit the transfer to any department against the objection of the judge there sitting."

This court granted the petition and by an order made on September 13, 1915, annulled and set aside previous rule 2 and ordered that rule 2 as set forth in the judges' petition be promulgated for the district court of the first judicial district, and this was the rule in effect at the time of the decision of the supreme court in State ex rel. Magnuson v. District Court, 125 Mont. 79, 231 Pac. (2d) 941, and remained the rule until September 16, 1957, at' which time this court permitted the judges of the first judicial district to promulgate their own rules of court. In re Rules of Practice, 132 Mont. 603, 315 Pac. (2d) 515.

In the case of State ex rel. Magnuson v. District Court, supra, and on January 30, 1950, the county attorney of Lewis and Clark County filed an information charging one John P. Phillips with the crime of receiving stolen property. Leave to file the information was granted by the Honorable A. J. Horsky, one of the judges of the first judicial district presiding in department No. 1 of that court and the cause was assigned No. 2655. Later and on April 29, 1950, the defendant moved to suppress certain evidence and this motion came on for hearing on May 5, 1950, in department No. 1 of the district court of the first judicial district, before Judge Padbury, presiding judge of department No. 2, at which time the county attorney objected to the matter being heard at that time before Judge Padbury, then the presiding judge of such department. Apparently, at the time of the commencement of the criminal case against John P. Phillips, without any change in the rules all criminal cases had been tried in department No. 2 and other

matters by department No. 1. This was not denied. The motion to suppress the evidence was sustained on November 14, 1950, and the county attorney then brought proceedings in this court to set aside and annul Judge Padbury's order granting the defendant's motion to suppress the evidence. In his petition to annul Judge Padbury's order the county attorney averred that it was the usual practice of the first judicial district to try all criminal matters in department 2 presided over by Judge Padbury, but that the judge announced in view of the fact that he intended to appear as a defense witness he deemed it improper to preside in the criminal matter, and for those reasons agreed with Judge Horsky that Judge Horsky should preside in the criminal action. The supreme court issued an alternative writ on March 10, 1951, ordering the district court of the first judicial district and the Hon. George W. Padbury, Jr., one of the judges thereof, to appear on March 23, 1951, and show cause why the minute entry suppressing the evidence in the case of State v. Phillips should not be vacated, annulled and set aside and why said Judge Padbury should not be enjoined from further participating in said cause as presiding judge thereof.

On the return day Judge Padbury, on behalf of the district court of the first judicial district, filed a motion to quash. He likewise filed an affidavit and therein, *inter alia,* stated the hearing upon the motion to suppress evidence involved a matter of law entirely unrelated to any of the facts involved in the trial of the criminal action and that he did not at any time agree that Judge Horsky should preside in the cause after the filing of the information therein. In that case, the court stated the rule assigning the business of the court and apportioning the duties of the judges in each of the two departments had been more honored by the breach than by the observance. This court held that Judge Padbury had no authority to hear the motion to suppress the evidence in cause No. 2655, State v. Phil-

lips, and all proceedings had before him were void, set aside and held for naught.

In that case, State ex rel. Magnuson v. District Court, supra, the court at page 83 said:

"This court held that upon a change in the personnel of the court, there may be a reapportionment of its business. But 'because a distribution of business is personal to the judges, it is not a subject within the purview of court rules; and rule No. 2, adopted in 1905, while effective as the expression of the will of the judges in office at that time, is not binding upon the present judges. * * * In the absence of any agreement between these two judges upon an apportionment of the business of the court between them, or, what is the same thing, between their departments, either one, when in open court, possessed all the power and authority of the district court to hear and determine the case of State ex rel. Little, [49 Mont. 158, 141 Pac. 151] and, *cognizance of that cause having been first taken in department No. 2, it was beyond the power of any other court of concurrent jurisdiction, or any other department of the same court, to interfere. These rules are elementary, and their observance necessary to the orderly dispatch of business and the protection of the rights of litigants.'*" Emphasis supplied.

Even though the divorce suit in the first instance was properly assignable to department No. 1, presided over by Judge Padbury, by reason of the odd number assigned the case, still, Judge Fall, judge of department No. 2, having assumed jurisdiction of the cause and having heard the same and granted the decree of divorce complained of, it was beyond the power of Judge Padbury, the judge presiding over department No. 1, to interfere in any way. State ex rel. Little v. District Court, supra, 49 Mont. 158.

The purported judgment and decree rendered by Judge Padbury, who presided over department No. 1, annulling the decree of divorce granted by Judge Fall, presiding in department No. 2, was and is wholly void under the principles of law enun-

ciated by this court in State ex rel. Little v. District Court, supra, and State ex rel. Magnuson v. District Court, supra. Here, defendant should have presented her proceedings to annul the former decree in department No. 2 before Judge Fall, the judge who granted the decree. In McGuinness v. Superior Court, 196 Cal. 222, 235, 237 Pac. 42, 40 A.L.R. 1110, the court in summarizing what was stated in 2 Bishop, Marriage, Divorce and Separation, section 1549, 1554 and 1556, said: * * * the proceeding for annulling the decree must be in the same court and cause wherein it was rendered and where remains the record which is to be vacated.''

It is now necessary to consider the propriety of the decree ▮ of divorce given, made and rendered by Judge Fall, the judge presiding over department No. 2. At the time the demurrer to plaintiff's complaint was interposed by defendant's counsel, no objection of any kind was lodged against the cause being heard by Judge Fall, either upon the grounds of lack of jurisdiction or upon any other grounds. That Judge Fall, under the provisions of the Constitution referred to, and in the absence of objection, had jurisdiction to hear the divorce case cannot be denied. Jurisdiction is a right to adjudicate concerning the subject-matter in a given case. The three essential elements are: (1) The court must have cognizance of the class of cases to which the one to be adjudged belongs. (2) The proper parties must be present. (3) The point decided must be, in substance and effect, within the issue. Sloan v. Byers, 37 Mont. 503, 97 Pac. 855.

In the instant case it must be admitted that the Hon. Victor ▮▮ H. Fall, as judge of department 2, (1) had cognizance of the divorce action between plaintiff and defendant; (2) that when counsel for plaintiff and defendant appeared before him at the time the demurrer was overruled, the proper parties were present; and (3) the point decided, in substance and effect, was within the issue involved in that case. Further, there can be no question that objection to jurisdiction of person and

objection for procedural defects may be waived when jurisdiction of subject-matter exists. State ex rel. Stephens v. Keaster, 82 Mont. 126, 266 Pac. 387. Parties voluntarily submitting a controversy to a court having jurisdiction of the subject-matter cannot question its authority. Hall v. Hall, 70 Mont. 460, 226 Pac. 469.

In the case at bar the defendant, having interposed a demurrer to plaintiff's complaint, thereby invoked the jurisdiction of the court to determine and adjudicate the sufficiency of the complaint and of the cause of action therein stated and thereby asked relief beneficial to her. This required the exercise of jurisdiction on the part of the court in the action and the defendant, by invoking the jurisdiction of the court to grant her beneficial relief, entered her appearance for all purposes. Knebel v. Rennie, 87 Okla. 136, 209 Pac. 414; Hall v. Hall, supra. See also Meisenheimer v. Meisenheimer, 55 Wash. 32, 104 Pac. 159, 163.

Jurisdiction is the power to hear and determine the particular case presented for consideration and to render such a judgment as the law authorizes in that case. In other words, it is the power to hear and determine the questions *coram judice* in that particular case. Crawford v. Pierse, 56 Mont. 371, 185 Pac. 315, 318, and cases cited.

In Gilna v. Barker, 78 Mont. 357, 364, 254 Pac. 174, the court said:

"A party desiring to challenge the jurisdiction of the court over his person must make a special appearance therefor. (Hinderager v. MacGinnis, 61 Mont. 312, 202 Pac. 200.) Any kind of appearance, except a special appearance, limited to challenging jurisdiction of the person, is a general appearance, and a general appearance waives any question of jurisdiction of the person. (State ex rel. Mackey v. District Court, 40 Mont. 359, 106 Pac. 1098, 135 Am. St. Rep. 622; Stoffels v. Cherry, 67 Mont, 443, 215 Pac. 1098; State ex rel. Carroll v. District Court, 69 Mont. 415, 222 Pac. 449.)

"Having appeared generally, defendants thereby waived the question of jurisdiction of their persons."

In Holt v. Sather, 81 Mont. 442, 264 Pac. 108, the court said:

"*In an action at law or a suit in equity, in the absence of voluntary appearance of a defendant,* a summons is the instrument by which the court obtains jurisdiction of the person of the defendant. The service of the summons is the method by which the court brings the defendant within its jurisdiction. Without jurisdiction, there cannot be a valid judgment. *Without voluntary appearance or legal service of summons, jurisdiction is not acquired. (21 R.C.L. 1262.)*" Emphasis supplied. See also Reed v. Woodmen of the World, 94 Mont. 374, 22 Pac. (2d) 819; 14 Am. Jur., Courts, section 193, page 387; Blair v. Blair, 48 Ariz. 501, 62 Pac. (2d) 1321.

In the case at bar, defendant, by interposing a demurrer to ■ plaintiff's complaint, made a voluntary appearance and as such, it was a general appearance.

In the absence of extrinsic fraud, the decree of divorce given, made and rendered by Judge Fall was legal and free from attack, direct or collateral.

This brings us to the most serious contention of respondent, that in the procurement of the divorce, extrinsic fraud was involved as were property interests. Appellant's position is that the divorce action having been brought solely to sever the marriage relation, the action abated after the entry of the decree followed by the death of plaintiff, citing Kirschner v. Dietrich, 110 Cal. 502, 42 Pac. 1064, 1065; Blair v. Blair, 96 Kan. 757, 153 Pac. 544, 546; Lima v. Lima, 26 Cal. App. 1, 147 Pac. 233, and other cases.

Appellant's position is tenable if property interests are not ■ involved.

Many cases announce the rule that where only the personal relationship of the parties to a divorce action is expressly involved, an appeal will abate upon the death of one of the parties pending its determination. But the rule is almost universally

recognized that such is not the case where property interests are involved. Judson v. Anderson, 118 Mont. 106, 165 Pac. (2d) 198.

Briefly and succinctly stated, respondent's claim of extrinsic fraud is based upon the fact that Paul F. Deich obtained a decree of divorce on the ground of desertion, whereas, the parties were separated by mutual consent. The property interests are only incidental in that by virtue of numerous conversations between Paul and Louise, Paul had, according to Louise, promised to convey to her real and personal property. The usual claim of property rights in favor of the wife attaching to the marital relationship in the form of dower and succession rights to the husband's property, and the right to his support, was not raised in the court below. Such rights, of course, could be insisted upon if the judgment and decree appealed from in this cause were to be affirmed. There was no direct proof of any agreement to convey to Louise any particular property, real or personal, other than for Louise's statement the home was located at 142 Hiawatha, Helena. As late as August 8, 1955, which was subsequent to the decree of divorce, Paul indicated, according to Louise, he intended to sell the Helena property and purchase a new home in East Helena. At this time Louise was in Helena on vacation; Paul was ill when she arrived in Helena on August 8, 1955, and left for Seattle on the following Saturday which would be August 13, 1955. Paul died on September 8, 1955, and there is no proof in the record of the description of real property to be transferred or any description of personal property Paul was to convey by bill of sale. There was no specific evidence adduced as to whether in consideration of being allowed to obtain a divorce, Paul was to convey the Helena property to defendant, or sell the same to a third person and purchase East Helena property in his name, defendant's name or jointly. Paul's lips being sealed in death, the plaintiff was in no position to refute these or other charges

contained in the affidavit of merits and in Louise's testimony, such as it was.

In Marcellus v. Wright, 65 Mont. 580, 212 Pac. 299, the court said:

"When should a court determine to admit the testimony of the survivor against one whose 'mouth is stopt with dust'? Manifestly only when it appears to the court that, in view of all the surrounding facts and circumstances, injustice will result if the testimony is excluded. While undoubtedly the power to admit and reject such testimony is reposed wisely in the sound discretion of the trial court, it cannot be too careful in exercising that discretion. Every judge has observed the freedom with which a witness testifies who knows he cannot be contradicted. Courts should scrutinize with more than usual care the quality of proof presented in such cases, and when the testimony relates to oral communications between the witness and the deceased, it must be viewed with caution. (Sec. 10672, Rev. Codes 1921 [now R.C.M. 1947, section 93-2001-1]; Gauss v. Trump, 48 Mont. 92, 135 Pac. 910; Escallier v. Great Northern Ry. Co., 46 Mont. 238, 127 Pac. 458, Ann. Cas. 1914B, 468; McCrimmon v. Murray, 43 Mont. 457, 117 Pac. 73; Gray v. Grant, 62 Mont. 452, 206 Pac. 410. In the Escallier Case, supra, Mr. Chief Justice Brantly, in commenting upon the declarations of deceased persons, said: 'Speaking generally, this character of evidence is the weakest and least satisfactory of any in persuasive value. "With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that. the witness by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say." (1 Greenleaf on Evidence,

16th. ed. sec. 200.)  *  *  *  Though the witness who testifies to the oral statement may be honest, his memory may be at fault, or he may have failed to comprehend and interpret the statement as it was intended to be understood by the speaker. *  *  *  Moreover, so easy is it to fabricate such evidence that there is strong temptation to a dishonest, interested witness to do so. (17 Cyc. 806, and notes.) After enumerating these elements of weakness, the author of the article in Cyc. on this subject, at page 808, remarks: "Exposed to all the infirmities just mentioned is the testimony to oral statements of dead men, which is invariably subjected to the closest scrutiny in view of the impossibility in most cases of convicting the witness of perjury if his testimony is willfully false." ' (And see Sanger v. Huguenel [65 Mont. 236, 211 Pac. 349.])"

What is extrinsic fraud? In Kennedy v. Dickie, 34 Mont. 205, 219, 85 Pac. 982, this court said:

"It is also as well-settled by the adjudicated cases and text writers that the fraud in respect to which relief will be granted in any case must have been practiced upon the unsuccessful party, with the result that he has been prevented from fully and fairly presenting his case for consideration. In short, the situation in the case must have been such that there has never been a decision in a real contest over the matter in controversy. The fraud must have been extrinsic and collateral to the matter tried by the department, and not in a matter tried upon its merits and upon which the decision was rendered."

The above statement of law was quoted at length in Clark v. Clark, 64 Mont. 386, 210 Pac. 93, and in that case, wherein the court speaking through Mr. Justice Holloway said:

"What, then, is meant by the expression 'fraud which is extrinsic or collateral to the matter tried by the court?' It is extrinsic or collateral within the meaning of the rule, when the effect of it is to prevent the unsuccessful party from having a trial or from presenting his case fully, as, for instance, keeping him away from court by false promise of compromise, or

purposely keeping him in ignorance of the pendency of the action, or where an attorney fraudulently pretends to represent a party and connives at his defeat, or being regularly employed, sells out his client's interest (15 R.C.L. 763), or where a party residing without the jurisdiction of the court is induced by false pretenses or representations to come within the jurisdiction for the sole purpose of getting personal services of process upon him, or where, through the instrumentality of the successful party, the witnesses of his adversary are forcibly or illegally detained from court or bribed to disobey the subpoena served upon them, or where a judgment is obtained in violation of an agreement between the parties.''

To determine whether Louise's claim of fraud comes within the rule announced in Clark v. Clark, supra, we must consider her affidavit of merits and her testimony offered in support thereof. This affidavit, when stripped of allegations unnecessary to a decision of this case, *inter alia,* alleged the accumulation of real and personal property from joint funds of Paul and Louise; that incompatibility developed between the parties; that Louise needed a vacation and should go to Denver, Colorado, and there live separate and apart for a time in order to see whether or not ''absence makes the heart grow fonder''; that on or about October 1, 1953, with the knowledge and consent of Paul, Louise did go to Denver, Colorado, and was there employed and remained until May 1954, when she returned to Helena, Montana, spent some time with Paul, living with him in her home in Helena, at which time she told him about a job which she could obtain in Seattle, whereupon he suggested that she take the job in Seattle, and that they would sell their Helena home and purchase one in East Helena, Montana; that in conformance with his wishes she did go to Seattle in May 1954; that they continued to correspond with each other and to talk with each other over the telephone during all of which time no mention was made about her having deserted him or about him wanting a divorce. Thereafter, and

in March 1955, Louise learned from her son, by a former marriage, that Paul was talking about wanting a divorce, whereupon she called him on the telephone and for the first time learned he did desire a divorce. He advised her he would pay all of the expenses, get her a lawyer and that there would be no publicity; that the grounds of divorce would be desertion. Louise then avers in her affidavit she remonstrated with Paul and he told her that he would fix up a deed to the real estate conveying it to her and would see that she got a bill of sale of the personal property; that he had his insurance endorsed giving everything to her and that the deed, bill of sale, and insurance policies would be forwarded to her as soon as the divorce was secured; that thereafter she received a letter from one of Paul's counsel, together with a request that she go before a notary public in Seattle, Washington, and sign it (which she did), this for the purpose of having Attorney William A. Brown of Helena, Montana, whom she had never known or seen, represent her in the divorce action; that the letter was dated May 5, 1955; that she was of the opinion a divorce suit at that time had already been commenced; that some several months later she learned no divorce suit was pending nor had had any been filed on May 5, 1955; that she further learned it wasn't until July 12, 1955, that the divorce suit had been commenced; that between May 5, 1955, and July 12, 1955, she called Paul on the telephone many times wanting to know what happened about the deed to the real estate and the bill of sale for the personal property and he advised her that he was having them recorded and would send them on to her as soon as they had been returned to him from the clerk and recorder; that in August 1955 she received word that Paul was ill, telephoned him and he asked her to come to Helena to care for him, which she did, arriving on or about August 8, 1955; that she moved into her old home and lived with him and took care of him until some period not stated but in 1955; that during this period of time and while living with Paul, he asked her to for-

get about the deed and bill of sale so long as they were living together again, and that it would be just like a common-law marriage and the same as if they had never been divorced; that Paul requested her to return to Seattle, quit her job and come back to Helena so they could live together as they had always done; that they would sell their home in Helena and buy one in East Helena; that Louise did return to Seattle in order that she might give notice to her employer of her intention to quit and move back to Helena, but that before her employer had found someone to take her place Paul died; that she had never deserted him and that her absence from Helena was with the knowledge and consent of Paul; that the agreement between them, as entered into for the purpose of securing a divorce, was collusive as defined by sections 21-118, and 21-120, R.C.M. 1947, and that the divorce should have been denied.

Nowhere in Louise's affidavit, or in her testimony in support thereof, is it made to appear, within the meaning of the rule announced in Clark v. Clark, supra, that Paul in any way had prevented her from having a trial, or from presenting her case fully. Neither does it appear from the affidavit that Paul kept her away from court either by false promise of compromise, or that he kept her in ignorance of the pendency of the action. Nor is there any charge whatsoever that any attorney fraudulently pretended to represent her, or connived at her defeat, or sold out her interest, or that she, directly or indirectly, was induced to come within the jurisdiction of the court for personal service of process, or that her witnesses were forcibly, illegally or otherwise, detained from court or bribed to disobey any subpoena served upon them, or that any judgment was obtained in violation of any agreement between them. Nor has it been shown there was any agreement between them whereby, in consideration of Paul obtaining a decree of divorce from her, he would convey any real or personal property to her.

Louise sought to prove an "agreement" which, according to

her brief, was to show fraud upon which she relied thus enabling Paul to obtain an unjust judgment. She testified:

"Q.  In your affidavit in support of your motion you have stated that as a result of your and his working you sometimes became irritable, disagreed and quarreled, between you. Is that correct? A.  Yes, sir.

"Q.  On September 28, or about September 28, 1953, it was decided you needed a vacation and should go to Denver, Colorado, and that you and your husband would live separate and apart for a while to see if the absence would make the heart grow fonder. Is that correct? A.  Yes, sir.

"Q.  Was that actually an agreement between the two of you? A.  Yes, sir."

Later, Louise, referring to telephone calls had with Paul, testified as follows:

"Q.  Did you in your talks with your husband remonstrate with him and tell him you weren't in favor of this divorce? A.  I told him we had had an agreement that I would go away for two years, and that any time within that two years we would decide what we were going to do and that two years would have been in October, 1955. I told him I didn't think we should go ahead and make a decision."

At best, it is impossible to determine whether there was one agreement or two. In any event, if the first-quoted testimony constituted the agreement, it was wholly silent on the question as to whether divorce proceedings were to be instituted after Paul and Louise lived separate and apart "for a while". If the second-quoted testimony constituted the agreement, it likewise is silent on the question as to whether divorce proceedings were not to be instituted until after the lapse of two years.

The most that can be said from the facts, garnered from her affidavit of merits and testimony offered in support thereof, is that her absence was at all times by and with the consent of Paul, and at his insistence, ergo, there could have been no desertion.

██ Paul, in his complaint, alleged as a ground for divorce, desertion on the part of Louise. As previously related, Louise interposed a general demurrer to the complaint. It is axiomatic in considering the merits of the demurrer the material allegations of the pleading attacked are to be taken as true. Toomey v. Penwell, 76 Mont. 166, 245 Pac. 943, 45 A.L.R. 993; Montana State Board of Examiners in Photography v. Keller, 120 Mont. 364, 185 Pac. (2d) 503.

██ Here, when Louise authorized Attorney Brown to represent her in the divorce proceedings, she knew, according to her own affidavit, that if Paul was to obtain a divorce on the grounds of desertion, it could be obtained only by false testimony; hence the obligation developed upon her to appear in the action and contest the truth of the testimony concerning that fact, and, having failed to do so, she was thereafter precluded from raising the question either by motion or by a separate suit to set aside the decree. She had the opportunity to appear at the trial, and her position now is no different from what it would have been if she had apepared and had presented the same evidence *ore tenus* which she presents upon the motion by affidavit, and the court had nevertheless accepted Paul's testimony as true and made the same decree which was rendered. Clark v. Clark, supra.

In the case at bar, we hold extrinsic fraud has not been established.

██ Complaint is made that when Louise authorized Attorney Brown to represent her, the divorce suit had not been pending and was not commenced until a later date. We consider this of no import.

██ Complaint is further made Louise did not know Attorney Brown whom she authorized to represent her. Apparently, she feels she is entitled to relief of some kind, even though she presented no charges of misconduct against her attorney. In this case, on the point raised the following fundamental maxims of jurisprudence deny relief to her. "He who con-

sents to an act is not wronged by it." R.C.M. 1947, section 49-107. "Acquiescence in error takes away the right of objecting to it." Id. section 49-108. "No one can take advantage of his own wrong." Id. section 49-109. "He who can and does not forbid that which is done on his behalf is deemed to have bidden it." Id. section 49-111.

Application of these maxims alone to the facts should suffice to demonstrate that Louise has not shown herself entitled to the relief she deems herself entitled to. Federal Lank Bank v. Gallatin County, 84 Mont. 98, 274 P. 288.

In the case at bar, the record discloses that on July 12, 1955, Attorney Brown, pursuant to Louise's written authority, interposed a demurrer on her behalf to Paul's complaint. It was overruled and Louise refused to plead further, whereupon the divorce was granted to Paul. In her brief and in her affidavit of merits, she refers to the fact that she has never known or seen her said attorney. Her testimony further shows that, with the exception of the letter authorizing her attorney to appear for her in the divorce action, she did not know her attorney, had never seen him, had never talked with him, nor had any communication of any kind with him. It is to be noted that nowhere in the entire proceedings is the integrity of her attorney impugned in any way. No official misconduct is charged against said attorney, nor is it alleged, stated or shown that he was guilty of fraud in any way. In fact, the whole case shows that no attorney for either of the parties, past or present, was guilty of any fraud, corruption, misconduct or wrongdoing.

Louise further complains that no copy of the summons or complaint was served upon her. If error was thus committed, it was cured by her general appearance in the action.

In his brief, counsel for Louise cites the case of Gillen v. Gillen, 117 Mont. 496, 159 Pac. (2d) 511. In that case there was no service of the summons or complaint. Further, an appearance was made on behalf of the defendant wife by means of a forged letter which purported to authorize and direct an

attorney to appear for her. A demurrer to the complaint was interposed by an attorney innocently relying upon the forged letter of authority as being genuine. The demurrer was over-ruled, the defendant refused to plead further and a decree fol lowed. The plaintiff re-married and was subsequently killed in a bomber crash, he having been in the army air forces at the time. Later, the first wife filed a motion to set the decree aside on the grounds of fraud. The second wife intervened. A hearing was had and the decree of divorce was set aside. The second wife appealed to this court. The first wife appeared but no appearance was made on behalf of the deceased husband. This case is of no help to us in the case at bar, for here, an appearance was authorized in writing whereas in the Gillen case, the alleged appearance was based wholly on a false and forged letter of authorization.

At the outset, we are confronted with a motion to strike por-tions of the transcript herein and to dismiss this appeal which motion was served and filed by counsel for Louise, the respond-ent herein. Therein complaint is made that the bill of excep-tions signed, settled and allowed in the court below does not contain all of the proceedings had at the trial upon which the appellant relies as required by the provisions of section 93-8017, R.C.M. 1947. The respondent further complains that certain parts and portions of the transcript on appeal were not presented to the trial court in a bill of exceptions nor were such a part of the judgment roll in the matter before the trial judge and are, therefore, not properly before this court and should be stricken from the transcript.

The respondent further complains there is nothing before this court which will inform the court of the nature of the pro-ceedings which was before the trial court for decision since the judgment in the divorce action, the moving papers of the re-spondent to be relieved from the judgment, and the answer of appellant to such moving papers, have not been presented to this court for review; that the time for presentment of such

matters has expired and that by prior decisions of this court, it has been held the only method by which the papers used by the court below on the hearing can be certified to the supreme court as the papers used on the hearing is by incorporating them in a bill of exceptions; and that the transcript was not prepared, certified or served as required either by statute, court rule or court order.

The respondent overlooks the provisions of section 93-5505, R.C.M. 1947, which pertains to the settlement of a bill of exceptions. It is there provided the appellant "must prepare and file with the clerk of the court and serve upon the adverse party a bill of exceptions, containing all of the proceedings had at the trial upon which he relies. * * *

"Within ten days after such service, the adverse party may propose amendments thereto, and serve the same, or a copy thereof, upon the other party.

"The proposed bill and amendments must, within ten days thereafter, be presented by the party seeking the settlement of the bill to the judge who tried or heard the case, upon five days' notice to the adverse party, or be delivered to the clerk of court or judge. * * *

. "When received, the judge must designate the time and place at which he will settle the bill, and the clerk must immediately notify the parties of such designation. At the time designated, the judge must settle the bill."

Here, respondent wholly failed to propose amendments to the proposed bill of exceptions. Under the provisions of section 93-8017, R.C.M. 1947, "On an appeal from an order, except an order granting a new trial, the appellant must furnish the court with a copy of the notice of appeal, of the judgment or order appealed from, and of all papers and evidence used on the hearing in the court below. * * *"

In construing this section, this court has held that in probate proceedings, the provisions of the code "regulating bills of exceptions, statements and appeals in ordinary actions"

are applicable, and, so far as this may be, "the analogies between them must govern." In re Dougherty's Estate, 34 Mont. 336, 341, 86 Pac. 38.

Further, that the record prepared under section 93-8017, supra, embodying a bill of exceptions will be ·examined as to the sufficiency of the evidence, solely for the purpose of ascertaining "whether the judgment is supported by any substantial evidence." Clifton-Applegate-Toole v. Drain Dist. No. 1, 82 Mont. 312, 320, 267 Pac. 207.

It is evident the bill of exceptions referred to in section 93-8017 is the bill of exceptions prepared under the provisions of section 93-5505, supra. Here, the respondent proposed no amendments to the bill of exceptions, and cannot now be heard to say the bill of exceptions does not contain all of the proceedings had at the trial upon which the appellant relies as provided by section 93-8017, supra. Further, the respondent, at any time prior to the submission of the cause to this court, could have suggested a diminution of the record so as to correct the same under Rule VI of this court. So too, relief could have been had under the provisions of section 93-8021, R.C.M. 1947.

R.C.M. 1947, section 93-8019, provides: "* * * All objections to the record and brief of appellant shall be deemed waived unless a motion to dismiss is made because thereof, except such as will prevent a fair hearing, consideration, and decision of the appeal on its merits * * *"

In this cause, Judge Padbury's judgment and decree of March 10, 1956, declaring null and void the previous decree of divorce given, made and entered by Judge Fall, being void for all purposes, it follows that if this court were to strike from the transcript herein the parts and portions thereof sought to be struck from the record by respondent and in addition dismiss the appeal for the reasons in said motion stated, this court would, in effect, affirm a void judgment, sanction the

commission of an unlawful act, and thus set a precedent for future miscarriage of justice.

Under the provisions of section 93-8020, R.C.M. 1947, it is provided: "The dismissal of an appeal is in effect an affirmance of the judgment or order appealed from, unless the dismissal is expressly made without prejudice to another appeal." Owsley v. Warfield, 7 Mont. 264, 265, 17 Pac. 74; McIntosh Hardware Co. v. Flathead County, 32 Mont. 254, 256, 80 Pac. 239; Carlson v. City of Helena, 43 Mont. 1, 5, 114 Pac. 110.

To insure the proper administration of justice, under the facts in this case, technical questions of practice have been disregarded. To hold otherwise would result in this court declaring legal a void and illegal judgment and decree rendered by Judge Padbury and thus permit the respondent to enjoy the fruits of her own unlawful act, namely, the obtaining by her of an unlawful judgment and decree which in turn declared null and void a previous lawful decree of divorce. Accordingly, the motion to strike certain parts and portions of the transcript and to dismiss the appeal is overruled and denied. In this cause, to take any other view than that of considering the transcript would be chasing a shadow at the expense of letting the substance escape. Sevanin v. Chicago, etc. Ry. Co., 62 Mont. 546, 205 Pac. 825.

All of the proceedings had before Judge Padbury, wherein and whereby the previous decree of divorce granted by Judge Fall was set aside are hereby declared to be null and void, and all thereof are set aside and held for naught.

It is so ordered.

MR. CHIEF JUSTICE HARRISON, JUSTICES CASTLES, ANGSTMAN and ADAIR concur.