No. 81-356

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

_____

IN RE THE MARRIAGE OF

JOHN CARLYLE LAWRENCE,

                    Petitioner and Respondent,

    and

SHARON M. LAWRENCE,

                    Respondent and Appellant.

_____

Appeal from:  District Court of the Fourth Judicial District,
              In and for the County of Missoula,
              Honorable Jack L. Green, Judge presiding.

Counsel of Record:

    For Appellant:

        Ferguson & Mitchell, Missoula, Montana
        Kinsey & Lashlee, Long Beach, California

    For Respondent:

        Datsopoulos, MacDonald & Lind, Missoula, Montana

_____

                              Submitted on briefs: February 2, 1982

                                      Decided:    MAR 2 2 1982

Filed: MAR 2 2 1982

_____
                 Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This appeal arises out of the Fourth Judicial District, County of Missoula, State of Montana, from an order directing the wife to specifically perform a separation agreement that had been entered into with the husband in 1976 and incorporated into the dissolution decree of April 27, 1976. Specific performance consisted of wife's executing quitclaim deeds for certain mining properties, upon which a cloud to title apparently existed because they had at one time been held by the parties as husband and wife.

The wife responded to her husband's suit for specific performance by requesting, among other things, that the 1976 property settlement be set aside as unconscionable and a fraud on the court. Two lengthy hearings were held in July and August, 1980, followed by the court's order directing the wife to sign the deeds and denying her motion to set aside the property settlement.

The wife sets forth only two issues to be considered. The husband sets forth five issues out of the wife's suggested two, which we find more inclusive and useful for a proper discussion of the case. Those issues are:

1. Should the trial court have set aside the decree of dissolution entered in this matter on the grounds that it was obtained by a fraud on the court?

2. Is the separation agreement entered into by the parties unconscionable?

3. Is the separation agreement contrary to public policy?

4. Is the wife's attack on the decree of dissolution barred by laches?

-2-

5.  Should the trial court have refused to enforce the decree of dissolution on the grounds that the husband came before it with unclean hands?

The parties were married on March 27, 1968, at Mackey, Idaho, and have two children. Early in the marriage they moved to the Thompson Falls, Montana, headquarters of the U.S. Antimony Corporation. The husband is employed by the corporation as manager of mining, geology and metallurgy. He is also the largest stockholder with approximately 14 percent of the issued shares. At the time of the dissolution, the husband had between 660,000 and 800,000 shares valued by various parties from $.50 to $1.50.

The marriage was not one made in heaven. The wife's counsel describes it as mercurial, marked by disagreement and violence. In 1974, the husband filed for a divorce alleging adultery. The wife retained Missoula counsel, briefed him on her case and asked him to prepare a "post-nuptial agreement." Thereafter, the wife returned to the home in Thompson Falls, and the parties attempted a reconciliation. Both parties agree the reasons for the reconciliation were the children. During this period, the husband dismissed the original dissolution proceedings.

In 1976, for the same reasons given in his original cause, the husband reinstituted the dissolution of the marriage. This time, the wife obtained the services of another attorney who served her throughout the second dissolution proceedings. Numerous meetings were held by the new counsel with the wife and the husband's counsel. Again, a full disclosure of the property involved was discussed, and the wife was advised by counsel as to her rights to the

property of the couple. In fact, both counsel employed by the wife, the first who advised her in 1974 on the "post-nuptial agreement" and the second who represented her on the "property settlement, support and custodial agreement," advised her that she could, if she contested the dissolution, "get more property." The trial court noted in its Conclusion of Law XIII:

> "The Court would, under the circumstances of this case, ordinarily consider the Marital and Property Settlement unconscionable. However, the Respondent was represented by a very competent and knowledgeable attorney. She entered into the Property Settlement Agreement with a fairly complete knowledge of the marital assets and despite the protestations of her counsel that he felt the property settlement was neither fair nor equitable and his advice that if she went to Court on the property aspects of the case she could probably get more."

However, nearly two years after the first filing by the husband, the wife directed her attorney to prepare for signature the separation agreement she now wants to set aside on the basis of fraud upon the court, coercion and unconscionability.

The separation agreement gave the wife four lots in Mackey, Idaho, with improvements thereon, including a house free and clear of liens and encumbrances, all the furniture in the house in Thompson Falls, attorney fees, moving expenses, $2,500, and maintenance of $200 per month for four years. The total amount to her in money and property was $60,800.

The husband fared much better. He received the family home in Thompson Falls and the ninety-nine acres on which it was located, all the stock in U.S. Antimony Corporation, an airplane, a pickup truck, and bank accounts amounting to

approximately $5,000. The total value of the property was between $227,000 to $422,500 depending on the value given the stock.

Of special note in arriving at the value of the stock is that, at the time of the dissolution, the stock was restricted by Security and Exchange rules which could have resulted in the husband receiving a price discount of as much as 50 percent if he had sold or transferred a substantial portion of the same. The husband testified that at the time of dissolution he had 660,000 shares. During the first trading quarter of 1976, free trading stock had a value of $.0875 to $1.00 per share. In addition, during the first quarter of 1976, the corporation was in serious financial trouble. The company's primary product was battery grade antimony. The market for this product collapsed in 1975 when the automobile industry switched to a calcium lead battery. Due to the switch, corporate profits went from $200,000 in 1975 to a loss of $213,000 in 1976. Substantial losses occurred in subsequent years as well. On April 1, 1976, the company was barely able to make its payroll. Shortly after the dissolution, the husband had to personally guarantee a small business loan of $300,000 to save the operations. Since 1976 the company has had to get into extensive research operations to find a use for a previously salable product. All of these facts were known to the wife and her attorney in deciding whether to try to obtain some of the stock in the property settlement. The decision of the wife was not to do so.

The wife now alleges that the husband personally attempted to persuade or coerce her into taking the one-

sided property agreement by threatening to get custody of the children. In addition, the wife alleges that the separation agreement approved by the court is faulty because it does not contain an inventory of the marital assets but merely lists what the wife is to receive and leaves the rest to the husband.

The District Court was also considering the husband's petition for specific performance. The U.S. Antimony Corporation owned mining claims in both Montana and Idaho. In 1979, three years after the dissolution, the corporation sought to sell the Idaho properties and to grant an easement to the Forest Service over some of the Montana properties. A title search revealed a cloud on the title involving the wife's name.

At the time of its acquisition, the husband took the Idaho property in his own name. He later assigned all rights to a predecessor corporation of U.S. Antimony Corporation and was reimbursed by the corporation for the downpayment. The corporation paid all sums remaining on contract. Since he was married to the wife at the time of acquisition, the question of an inchoate right in her arose, based on the marital relationship.

The acquisition of the Montana properties was handled in much the same fashion, except both the wife and husband signed the papers acquiring the property, and, on advise of the corporation's counsel, they signed only a mineral deed in transferring the claims to the company. As was done on the Idaho property, the husband was fully reimbursed for his downpayment, and the company paid the remainder. The record indicates neither of the parties intended to keep any

interest in the claims or surface rights and that neither paid money for which they were not reimbursed. The methods used in acquiring the properties by the corporation is common in the industry.

The first issue is whether the District Court should have set aside the decree of dissolution on the grounds that it was obtained by a fraud upon the court. This issue is not one of first impression in Montana. This Court recently considered the issue in Pilati v. Pilati (1979), ___ Mont. ___, 592 P.2d 1374, 36 St.Rep. 619, and in earlier cases before the Court. See, In Re Bad Yellow Hair (1973), 162 Mont. 107, 509 P.2d 9; Selway v. Burns (1967), 150 Mont. 1, 429 P.2d 640. However, the fact situation here differs from that of Pilati.

In Pilati the parties were married when the wife was sixteen years of age and the husband was thirty-eight. The marriage lasted thirteen years, and the parties had two children. The wife had a ninth grade education and had never been employed prior to the marriage. The husband held both a Bachelor's and a Master's degree, was working on a Ph.D. and, according to the briefs, he had a J.D. He not only was both a rancher and a high school teacher but had considerable experience in real estate appraisals. The record in Pilati indicated the husband handled all the finances of the family to the extent of purchasing every-thing, including groceries and clothing. The wife knew nothing of the parties' financial status which, it was alleged, was deliberately kept secret from her.

In the instant case the record does not indicate how much education the wife had. It would appear she did have a

-7-

job of some status at the time the couple met and were married. The court in its Conclusion of Law VIII noted that the marital property settlement agreement was entered into by the wife with full knowledge of the property owned by the parties and its value. Conclusion of Law IX indicated that she was represented by competent counsel in negotiations of the property settlement agreement. Conclusion of Law X indicated that she consented to the property agreement, and the property agreement was given freely and voluntarily without fraud, overreaching or undue influence.

In addition, at the two hearings there was considerable testimony indicating that both counsel who represented the wife, the attorney originally hired by her in 1974 and the attorney who drew up the property settlement agreement for her in 1976, advised her fully as to the fact that she probably could get more property if she went to trial. Clearly, we do not have a petitioner in the same status as the petitioner in Pilati v. Pilati, supra.

At the hearings both counsel for husband and wife testified. Their testimony indicated that, during the time of drafting the property settlement agreement and the dissolution of the marriage, there were at least ten conferences, either personal or by telephone, of some extended length, where counsel laid forth all of the facts concerning the property involved. There was nothing left under the table at the time the parties signed the agreement. In addition, it is to be remembered that the facts indicated that the wife brought the proposal for the property settlement to her counsel and directed him to put it into legal form and obtain the dissolution as soon as possible. At

that time, counsel advised her as to her rights, as he had previously done, and indicated that he did not think it was a good agreement. However, the wife insisted on having it finalized and, at that time, indicated none of the pressures that have been called to attention in other cases where such agreements have been set aside.

The wife urges this Court to adopt In Re Marriage of Gonzalez (1976), 57 Cal.App.3d 736, 129 Cal.Rptr. 566. Gonzalez is unique in that the husband's mere threat to, inter alia, take illegal custody of the children constituted duress sufficient enough for rescission of the contract. But, Gonzalez is not applicable here for in this case the husband filed the petition alleging adultery, a fact that apparently the wife did not want to be made public by going to trial because it might prevent her from getting her children. In Gonzalez the wife, not the husband, filed the petition for apparently good reasons. In Gonzalez the wife testified that she was so "distraught and worried about the children" that she did not remember signing the petition. That is not the case here. As previously noted, the wife brought the settlement she wanted to her attorney to put in legal form. Certainly she knew what it contained. In Gonzalez the court found that the wife was threatened that, if she did not sign when she did, she would lose everything. Here, the wife knew what she was getting and knew what her husband was getting. Further, she knew of her right to seek more in court.

The wife argues that the separation agreement must contain a full inventory of all the assets owned by the parties in order for the court to pass upon its conscion-

-9-

ability. Further, she contends the failure to include such inventory is a fraud upon the court under Pilati. Indeed, this Court has indicated that a full inventory of the assets should be made. However, we have not held that a lack of an inventory is fraud upon the court. We noted in Pilati that the fraud was the failure to disclose all the assets to the wife, not the failure to disclose all the assets to the court. Here, while the court may not have been fully advised as to all property owned by the parties, the record shows the court was not confused by the omission of a full inventory from the separation agreement.

The wife cites Hamilton v. Hamilton (1980), ___ Mont. ___, 607 P.2d 102, 37 St.Rep. 247, in support of her argument that the separation agreement must list all property owned by the parties. Hamilton is not applicable here. Hamilton involved a contested property distribution, and the problem in that case was that the trial court did not make findings sufficient to allow this Court to review its decision.

Where, as here, the totality of the circumstances support the trial court's findings that there was no duress or coercion, this Court will not reverse the decision unless it is clearly erroneous. The facts of each case will vary substantially. We recognize it is a common practice to raise the issue of child custody in many, if not most, marriage dissolution actions. By this opinion we do not encourage a challenge of negotiated property settlement agreements where custody rights have been settled on an arm's length basis as here. It would only be an exceptional case where we would consider the factors considered by the

California court in Gonzalez, supra.

We note further that in the case of Winters v. Winters (1980), ____ Mont. ____, 610 P.2d 1165, 37 St.Rep. 847, we held that a threat to reputation does not vitiate a party's consent. There, the wife discovered that her husband had engaged in adulterous relationships and demanded that he pay a certain sum of money per month as part of the property settlement agreement or she would drag her husband's lover's name through the mud. In a subsequent proceeding, the husband alleged that this was fraud and duress, but the court held it was not. While Winters is different from the present case because the threat was to a person who was not a party, that difference is not significant. In Winters the husband sought to avoid an embarrassing hearing, and that is a concern that exists whenever there is a threat to a reputation.

The second issue for consideration is whether the separation agreement entered into by the parties is unconscionable. We think not. The wife notes that "unconscionability", as a term of art referring to unfair contracts, has a far broader reach than the classical circumstances which were sufficient to void contracts (lack of consideration, fraud, duress, and undue influence), though it, of course, includes them. Unconscionability, as used in the Uniform Marriage and Divorce Act, is discussed in the Code Commissioner's comments on section 40-4-201, MCA.

The wife argues that the agreement was unconscionable in a number of respects. First, without sufficient justification it established a grossly disproportionate division of marital assets, awarding only $50,000 of the property to the

wife and $9,600 in alimony out of a $422,000 marital estate. The wife argues that the fact she received the advice of competent counsel before she signed the separation agreement did not in any manner dilute or mitigate the unfairness of the terms of the agreement or, as the testimony indicates, isolate her from the fear and anxiety created by her husband's threats and importunities. The wife would require that before the agreement was accepted by the court in 1976, the court should have been informed of all the circumstances and only then would it not be unconscionable.

It is apparent from the above that the wife would have the court look only at the numbers and conclude without further analysis that the distribution of the estate was grossly disproportionate and therefore unconscionable. However, with respect to certain kinds of property, courts must exercise substantial discretion in determining value. This is especially true in the case of stock values. In In Re Marriage of Lippert (1981), ___ Mont. ___, 627 P.2d 1206, 38 St.Rep. 625, this Court held:

> "The exercise of discretion by the District Court is necessary when determining the worth of marital assets which fluctuate in value. For example, the value of a particular common stock may change drastically during the course of a dissolution while the value of the family home or other personal property remains stable. Under such circumstances selection of a single evaluation point for determining net worth of the parties could create an inequitable disposition." 627 P.2d at 1208.

Here, as previously noted, relying solely on the market value of the stock in early 1976 would be inappropriate. The husband's stock was restricted and greatly reduced in value. The corporation which issued the husband's stock was in serious financial difficulty which caused a sharp

decline in the stock's value in 1976.  As previously noted,
the 1976 annual report showed a low figure of $.50 per share
in the fourth quarter of 1976.  The market of the corpora-
tion's main product had collapsed, and the corporation was
virtually out of cash.  In addition, the husband had person-
ally extended himself to guaranteeing a $300,000 small
business loan to keep the corporation operating and to pay
the salaries due.  The court must have considered these
facts in arriving at the conscionability of the separation
agreement.  The husband had only 14.5 percent interest in
the corporation.  Had he given some of this up or liquidated
a substantial portion of it and paid the proceeds to the
wife his position in the corporation would have been reduced
to such a point that his control would have been in serious
jeopardy.  Had that happened, it would have made no sense
for him to guarantee the $300,000 loan to the Small Business
Administration so that the corporation could have continued.
In addition, had the company collapsed after he borrowed the
$300,000, not only would his stock have been worthless but
there would have been no sources to pay the debt other than
his other assets, which were not sufficient.  In early 1976
it is unquestionable that the husband risked bankruptcy to
save the corporation.

Viewing these facts, the financial condition of the
company and the risk that the husband took to maintain the
company, neither this Court nor the trial court is compelled
to reach a conclusion that the property settlement was
unconscionable.  We noted in In Re Marriage of Jorgensen
(1979), ___ Mont. ___, 590 P.2d 606, 36 St.Rep. 233, that
where a husband received $692,701.84 (mostly in stock) and

-13-

his wife received $83,167, the disposition was not unconscionable.

The wife contends that all of the husband's actions amounted to undue influence, which would negate consent and make the agreement unconscionable. Under section 28-2-407, MCA, undue influence consists of:

"(1) the use by one in whom a confidence is reposed by another or who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him;

"(2) taking an unfair advantage of another's weakness of mind; or

"(3) taking a grossly oppressive and unfair advantage of another's necessities or distress."

Here it is unlikely that the wife had any confidence or trust in the husband in the latter years of the marriage, particularly after 1974 when the first divorce was filed and in 1976 when the final decree was granted. The evidence is conclusive that the wife was not suffering from any weakness of mind. Her attorney testified that the final agreement was based on her proposal and she understood its terms when she signed it. Divorces are frequently traumatic and arise in stressful situations. This does not mean that there is undue influence, especially if each party is represented by competent counsel. When all the relevant facts are considered, the agreement, while it may be different from what the court would have decreed in a contested matter, does not become unconscionable under these circumstances.

The next issue raised is whether the separation agreement is contrary to public policy. The wife would have this Court conclude that a separation is violative of public policy if one of the parties threatened a custody fight in

order to gain in the property distribution. While the wife contends that only rarely would a separation agreement be subject to attack on this ground, the fact is that such a ruling would expose many separation agreements to attack and worse, would not be based on any kind of a realistic understanding of preagreement negotiations.

The facts are that custody is frequently a bargaining chip in the settlement negotiations whether we like it or not. As noted in our discussion of the Gonzalez case, supra, we are not about to go as far as that court did in setting aside property settlements, such as we have here, as violative of public policy.

We find it unnecessary, in view of our holding on the principal issues presented, to consider the question of laches.

The final issue is whether the trial court should have refused to enforce the decree of dissolution on the grounds that the husband came before the court with unclean hands. Stated another way, did the trial court properly order the execution of the quitclaim deeds by the wife.

We have here several findings that have gone uncontested relevant to the issue for consideration. Neither party gave anything of value for the mining properties in question. It was never the intent of either to retain any kind of an interest in the mining properties. Further, it is the company, not the husband, which ultimately is entitled to receive the mining properties since it has paid for them. In view of these facts, the wife's argument loses much of its force, since the husband is not going to personally profit from the transfer of the quitclaim deeds.

The husband is seeking to enforce the decree of dissolution, not a contract. By its terms, section 27-1-415, MCA, on which the wife relies in asserting her defense of unclean hands, is applicable only to contracts. Here, the settlement agreement was incorporated in the decree and, as such, is enforceable as a judgment under the provisions of section 40-4-201(5), MCA. The wife could have challenged the property disposition provided in the decree by not signing it. However, she chose not to do so and cannot now be heard to argue what she could have done in 1976. See, Hopper v. Hopper (1979), ___ Mont. ___, 601 P.2d 29, 36 St.Rep. 1695.

The wife is collaterally attacking the decree. She is asserting that the decree is unenforceable because of circumstances under which it was entered into. This Court has previously held that a decree rendered free from extrinsic fraud may not be attacked collaterally or directly. Deich v. Deich (1958), 136 Mont. 566, 323 P.2d 35.

We find under the circumstances of this case the husband does not come before the court with unclean hands. Further, the unclean hands doctrine is not a defense to enforcement of a judgment, especially when the defense is based on acts occurring before the entry of judgment, and the judgment has not been set aside.

The judgment of the District Court is affirmed.

John Conway Harrison
Justice

-16-

We concur:

_____

_____
John C. Sheehy

_____

_____
Justices